UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MATTHEW J. HARRIS,

        Plaintiff,

    v.                                                     Case No. 21-C-1011

BRIAN FOSTER, et al.,

        Defendants.

---

## SCREENING ORDER

---

Plaintiff Matthew J. Harris, who is currently serving a state prison sentence at Racine Correctional Institution and representing himself, filed a complaint under 42 U.S.C. §1983, alleging that his civil rights were violated. This matter comes before the Court on Harris' motion for leave to proceed without prepayment of the full filing fee and motion to appoint counsel, and to screen the complaint.

### Motion to Proceed without Prepayment of the Filing Fee

Harris has requested leave to proceed without prepayment of the full filing fee (*in forma pauperis*). A prisoner plaintiff proceeding *in forma pauperis* is required to pay the full amount of the $350.00 filing fee over time. *See* 28 U.S.C. §1915(b)(1). Harris filed a certified copy of his prison trust account statement for the six-month period immediately preceding the filing of his complaint, as required under 28 U.S.C. §1915(a)(2), and has been assessed and paid an initial partial filing fee of $15.77. Harris' motion for leave to proceed without prepaying the filing fee will be granted.

## SCREENING OF THE COMPLAINT

The Court has a duty to review any complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity, and dismiss any complaint or portion thereof if the prisoner has raised any claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). In screening a complaint, the Court must determine whether the complaint complies with the Federal Rules of Civil Procedure and states at least plausible claims for which relief may be granted. To state a cognizable claim under the federal notice pleading system, a plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must be at least sufficient to provide notice to each defendant of what he or she is accused of doing, as well as when and where the alleged actions or inactions occurred, and the nature and extent of any damage or injury the actions or inactions caused.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

2

alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555 (internal quotations omitted).

### ALLEGATIONS OF THE COMPLAINT

At the relevant time, Harris was an inmate at the Waupun Correctional Institution. Dkt. No. 1. He names as defendants more than 30 individuals who worked at the institution: Brian Foster was warden; Wierenga was deputy warden; Meli was security director; Toria M. Van Buren, Kristina Deblanc, Devona Gruber, Gayle Griffith, and Jeffrey Manlove were doctors; Donna Larson and Nathan Tapio were nurses; Chrystal Marchant was the Health Services Unit (HSU) manager; Bonis and Judge Stark were social workers; Theander, Kyle Tritt, Keith Immerfall, Sanchez, Joseph Beahm, Mongey, Christopher Pass, Smith, Stanley Ridley, Martinez, Vollmer, McCawley, Whyte, O'Neil, Fishe, and John/Jane Doe were correctional officers; Yana Pusich was the corrections program supervisor; and Corene Giebel was the records supervisor. *Id*. at 1-4. Harris also names as defendants Waupun Memorial Hospital, Dr. Farhat Khan, and Nurse Michelle Schultz, both of whom worked at Waupun Memorial Hospital. Finally, he sues Agnesian Healthcare, which is a private corporation that employed Khan and Schultz and that allegedly was under contract with the Department of Corrections (DOC) to provide medical care in the prison wing at the hospital. *Id*. at 4.

The alleged incidents occurred between September 7, 2018, and September 12, 2018. Harris was prescribed Paroxetine, a psychotropic medication that allegedly induces thoughts of suicide and self-harm. *Id*. at ¶¶1-2. On September 7, 2018, Harris told Pass that, if he did not get help immediately, he would cut his wrists and kill himself. *Id*. at ¶3. Pass was dismissive of the comment but eventually contacted Deblanc, who ordered that Harris be placed on "observation status." *Id*. at ¶¶3-12. Deblanc told Pass to organize Harris' transfer to an observation cell but she

denied Harris' "request to have crisis-counseling provided." *Id*. at ¶¶8-12. Pass then contacted Immerfall, Smith, Tritt, and Beahm to help escort Harris to his new observation cell. *Id*. at ¶¶13-25.

During the escort, Pass, Immerfall, Smith, Tritt, and Beahm allegedly taunted Harris and said that they placed razorblades in Harris' new observation cell, so he could "cut [himself] up like a [] turkey." *Id*. at ¶¶14, 17-18, 23. This caused Harris severe emotional distress, and he used the razorblades in his cell to "cut approximately three-fourth of his ear (right) off" and to make five additional cuts in his left arm. *Id*. at ¶¶24-25. Harris states that there was a significant amount of blood from his injuries. *Id*. Harris explains that prison policy required correctional staff to inspect or monitor his observation cell every 15 minutes and record "significant incidents" in the incident log. *Id*. at ¶¶10-11, 26. During one of those observation checks, Ridley saw Harris' injuries and called for help. *Id*. at ¶31. Ridley confiscated the razorblade and filed an incomplete incident report. *Id*. at ¶¶29, 31-38.

Harris' injuries were too severe to treat at the institution, so Mongey drove Harris to the Waupun Memorial Hospital emergency room. *Id*. at ¶¶30, 39. Harris states that he was "disturbed" by Mongey's attempt to do wound care while they waited in the emergency room. *Id*. at ¶¶42-43. Harris only wanted emergency room medical staff to treat him, but Mongey stated that he "was trained in this stuff." *Id*. ¶43. Dr. Khan and Nurse Schultz treated Harris but "poorly reattached" his ear. *Id*. ¶40. Mongey took Harris back to the institution that same day, and Tritt placed him in the same observation cell. *Id*. at ¶¶45-46. Harris notes that the observation cell was cold and unsanitary and that the condition of the cell caused him additional distress. *Id*. at ¶¶21-22, 47-54. Harris asked Tritt to either move him to a different cell or clean the cell, but Tritt refused. *Id*. at ¶47.

4

Harris states that McCawley, Mahoney, and Sanchez worked at the institution the following day, on September 8, 2018. *Id*. at ¶110. Whyte and O'Neil worked at the institution on September 9, 2018. *Id*. Harris does not explain what happened on either of those days or what these individuals said or did in relation to this case. He only alleges that these individuals did not properly complete incident reports, as required by prison policy. *Id*. at ¶110.

On September 10, 2018, Deblanc went to Harris' observation cell to conduct a "mental status evaluation." *Id*. at ¶55. Harris told Deblanc that Pass, Immerfall, Smith, Tritt, and Beahm had worked together on September 7, 2018, to place razorblades in his observation cell, but she did not report this information to her supervisor, Van Buren. *Id*. at ¶¶55-60. Harris also complained about the conditions in his cell (lack of heat and sanitation and only receiving a "smock"), but Deblanc did not remedy the situation or provide extra security blankets. *Id*. at ¶55. She also denied his request for "crisis-counseling." *Id*.

After Deblanc left, Smith went to Harris' cell to "intimidate" him. *Id*. at ¶61. This caused Harris distress and he inflicted additional injuries to himself by "violently ripping/pulling/tearing ear (right) from his head" three different times that day. *Id*. at ¶¶62, 67, 72, 75. Correctional staff took Harris to HSU after each incident, and each time medical staff refused to reattach his ear at the institution. *Id*. at ¶¶63, 68, 72. Harris alleges that Martinez, Tritt, Vollmer, and Theander were required by prison policy to properly complete incident reports regarding these incidents but they failed to do so and that they failed to properly inspect and clean his observation cell before placing him back in his cell each time he returned to his cell. *Id*. at ¶¶64-65, 68-69, 72-74. Deblanc and the "on call" PSU clinician were both made aware of the events of that day. *Id*. at ¶¶66, 70-71. Harris states that Fishe also worked at the institution on September 10, 2018. *Id*. at ¶110.

5

The next day, September 11, 2018, Harris told Beahm that he inflicted additional self-harm to his ear. *Id*. at ¶76. Harris alleges Beahm left Harris in his cell (instead of immediately taking him to HSU), and he failed to properly complete an incident report. *Id*. Gruber arrived at his cell a few hours later to conduct a "mental status evaluation." *Id*. at ¶77. Harris complained about the condition of his cell (lack of heat and sanitation and only receiving a "smock"), but Gruber did not remedy the situation or provide extra security blankets. *Id*. at ¶¶77-79. Gruber also denied Harris' request for "crisis-counseling" and failed to report information to Van Buren. *Id*. at ¶¶77, 80-83. Harris received medical care for his ear at the institution a few hours later. *Id*. at ¶¶76, 84. Harris claims Martinez, Beahm, and Tritt were required to properly complete incident reports regarding the incidents of that day but they failed to do so. *Id*. at ¶84. Harris was then transported to the Waupun Memorial Hospital for further medical care. *Id*. at ¶¶85-86. Dr. Khan refused to treat his ear in the emergency room at that time. *Id*. Instead, Harris was taken back to the institution then taken to UW Health to reattach his ear. *Id*. at ¶¶87-89. Harris received surgery to reattach his ear at UW Health and was sent back to the institution later that evening. *Id*. at ¶90. Harris states that Van Buren, Stark, Bonis, Pusich, Marchant, Larson, Manlove, Tapio, Meli, Wierenga, and Foster were all then "notified" and "updated" about what had happened. *Id*. at ¶91.

The following day, September 12, 2018, Griffith went to Harris' cell to conduct a mental status evaluation. *Id*. at ¶92. Harris complained about the condition of his cell (lack of heat and sanitation and only receiving a "smock"), and he also complained about the behavior of correctional staff. *Id*. Griffith did not remedy the situation, provide extra security blankets, or report anything to Van Buren. *Id*. at ¶¶92-96. She also denied his request for "crisis-counseling." *Id*. Beahm went to Harris' cell later that day, and Harris reported that he needed help and was going to rip his ear out again. *Id*. at ¶¶97-98. Harris alleges Beahm responded, "go ahead and do

it, rip your ear off, I don't care." *Id*. at ¶99. Harris then ripped his ear off again and Beahm failed to properly document it. *Id*. at ¶¶100-01. Beahm took Harris to HSU and then to the strip-cage to await a transport to the hospital. *Id*. at ¶¶101-02. While in the strip-cage, Harris saw Beahm, Tritt, and a few other correctional officers in a "huddle." *Id*. at ¶103. They kept peering back at Harris, which caused him fear. *Id*. At the end of the huddle, Harris heard Beahm say, "I fucking love you guys." *Id*. A different correctional officer then responded, "don't worry sarg, it'll be like it never happened because you were never here." *Id*. at ¶104. Harris went back to UW Health and got his ear reattached again. *Id*. at ¶105. He also received narcotic pain medication. *Id*.

Giebel later told Harris that his mental health records for the time period between September 11 and September 13 "do not exist." *Id*. at 47, ¶¶106-07. Harris states that John/Jane Doe, Beahm, Tritt, and Griffith all failed to properly document and record incidents during this time period. *Id*. at ¶¶108-09. Harris seeks monetary damages, several injunctions, and a variety of other relief. *Id*. at 52.

### THE COURT'S ANALYSIS

"To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law." *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)).

Harris asserts "failure to protect" and "denial of medical care" claims against all named Defendants. Dkt. No. 1 at 49-50. To state a claim under the Eighth Amendment, Harris must allege: (1) "he presented an objectively serious medical need;" and (2) "a defendant [] responded [] with deliberate indifference, thereby resulting in some injury." *Lord v. Beahm*, 952 F.3d 902,

904 (7th Cir. 2020) (citing *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016)). A medical condition is objectively serious if it is "so obvious that even a lay person would perceive the need for a doctor's attention." *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). "All agree that suicide is an objectively serious medical condition . . . [and] prison officials cannot intentionally disregard a known risk that an inmate is suicidal." *Lord*, 952 F.3d at 904 (citing *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019)). Regarding the second prong, a defendant responds with deliberate indifference when he or she "actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. "This requires 'more than mere or gross negligence, but less than purposeful infliction of harm.'" *Lisle*, 933 F.3d at 716-17 (quoting *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)).

Harris alleges that Pass, Immerfall, Smith, Tritt, and Beahm taunted him while he was on his way to an observation cell on September 7, 2018, and that they placed razorblades in his cell with instructions to "carve [himself] up like a [] turkey." Dk. No. 1 at ¶14. Harris asserts that he found the razorblades and cut himself as they instructed. Based on these allegations, Harris may proceed with an Eighth Amendment claim against Pass, Immerfall, Smith, Tritt, and Beahm. Harris further alleges that, after he notified Deblanc of Smith's involvement in providing him with a razorblade, Smith returned to his cell to taunt and intimidate him, which caused Harris to further injure himself by ripping off his ear. Harris also alleges that, after he inflicted additional injuries to his ear, Beahm waited more than three hours before getting him medical attention and later encouraged him to further injure himself. Harris states additional claims of deliberate indifference against Smith and Beahm based on these allegations.

Harris may also proceed on a conditions-of-confinement claim against Tritt, Martinez, Deblanc, Vollmer, Theander, Gruber, and Griffith based on his assertions that he informed them

8

that his cell walls were covered in feces and graffiti promoting death and self-harm, but they refused to transfer him to a new cell or clean his cell. Harris also asserts that they knew his cell was very cold and that Harris had only a suicide smock, but they failed to provide him with ways to keep warm. These allegations are sufficient for Harris to proceed, at least for now. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1431-33 (7th Cir. 1996) (allegations of cold and other problematic conditions sufficient to state a claim).

Harris also states a claim against Deblanc, Gruber, and Griffith based on his assertions that, after he returned from the hospital, he continued to make threats of self-harm, but they only maintained his observation status without ordering additional restraints. Given that Harris continued to injure himself by repeatedly pulling off his ear, the record must be further developed to determine whether their response to Harris' continued threats of self-harm was constitutionally sufficient. *See Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (courts defer to a medical professional's treatment decisions unless "no minimally competent professional would have so responded under those circumstances").

However, Harris fails to state a claim against Pass based on his allegations that Pass initially delayed contacting psychological services and warned Harris that he better obey staff. According to Harris, at his urging, Pass eventually contacted psychological services, and Harris suffered no harm from the short delay. *See Lord*, 952 F.3d at 905 (noting that, to state a claim, a violation must cause the plaintiff injury or damages).

Nor does Harris state a claim against Ridley. According to Harris, after he showed Ridley the razorblade he used to cut himself, Ridley confiscated the razorblade and Harris was transported to health services for treatment. Nothing suggests that Ridley was deliberately indifferent to Harris' injuries.

9

In addition, although it is doubtful that Dr. Khan and Nurse Schulz are state actors, *see generally West v. Atkins*, 487 U.S. 42, 56 (1988), Harris fails to state a claim against them. Harris asserts that Dr. Khan and Nurse Schulz operated on his ear after his first act of self-harm. Harris alleges only that they "poorly reattached [his] ear." This gives rise, at most, to a claim of medical malpractice, which is not a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Harris' purported claim against Dr. Kahn following his later act of self-harm also fails. Dr. Kahn allegedly refused to treat Harris' subsequent injury due to a risk of infection, but Harris explains that prison officials then took him to a different provider, where his ear was reattached and he received pain medication. Although another provider apparently disagreed with Dr. Kahn's assessment, nothing in Harris' complaint suggests that the subsequent reattachment of his ear was compromised by the delay from Dr. Kahn's decision that surgery carried too many risks. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) ("evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim").

Similarly, Harris' allegations that Mongey provided inadequate treatment for his arm injuries when he used surgical glue and bandages fail to state a claim. Mongey's fumbling efforts to treat Harris' wounds may give rise to a claim of negligence, but they do not demonstrate deliberate indifferent to Harris' condition. *See Ortiz v. Webster*, 655 F.3d 731, 736 (7th Cir. 2011) (incompetence, negligence, or even gross negligence are insufficient to state a constitutional claim). And, given that Harris fails to state a claim against Mongey, Dr. Kahn and Nurse Schulz cannot be liable for failing to stop Mongey from treating Harris' injuries. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must be an underlying constitutional violation . . . .").

Nor does Harris state a claim against any prison officer or staff, including Martinez, Sanchez, Mongey, Ridley, McCawley, Whyte, O'Neil, Fishe, and Giebel, based on assertions that they failed to properly complete incident reports, did not inspect or maintain his observation cell despite being assigned to that cellblock, or otherwise violated prison policy. Violating prison policy does not in and of itself violate the Constitution. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). As previously explained, to be liable, an individual must have known about a deprivation of a constitutional right and failed to act; negligent performance of one's job duties is insufficient to state a claim.

The Court will also dismiss Foster, Meli, Wierenga, Van Buren, Bonis, Stark, Pusich, Marchant, Larson, Manlove, and Tapio. Harris appears to list every possible person who may have been aware that he has a history of threatening self-harm, but simply being aware of an inmate's suicidal history or suicidal tendencies does not make an individual deliberately indifferent each time the inmate tries to harm himself. Harris includes no factual allegations suggesting that any of these individuals were personally involved in or had actual knowledge of the specific events at issue, and the mere fact that they may have had supervisory authority over the individuals who were directly involved is insufficient for Harris to state a claim against them. *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Finally, the Court will dismiss Waupun Memorial Hospital and Agnesian Healthcare. Harris' complaint does not include any factual allegations against these entities, and there is no respondeat superior liability under §1983. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014).

# MOTION TO APPOINT COUNSEL

Harris also filed a motion to appoint counsel. Dkt. No. 8. He states that he is unable to afford counsel; the issues in this case are complex; he has limited access to the law library; he has limited knowledge of the law; his incarceration and COVID-19 will limit his ability to investigate the facts of this case; and the facts of this case will be "strongly disputed." *Id*. at ¶¶1-9.

In a civil case, the Court has discretion to recruit a lawyer for individuals who cannot afford to hire one. *Navejar v. Iyola*, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866-67 (7th Cir. 2013). In exercising its discretion, the Court must consider two things: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (quoting *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007)). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" *Henderson v. Ghosh*, 755 F.3d 559, 564 (7th Cir. 2014) (quoting *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014)).

The Court is satisfied that Harris made reasonable attempts to recruit counsel on his own, so he satisfies the first prong. Dkt. No. 8, ¶3; *see also* Dkt. No. 8-1. However, the Court will deny Harris' motion because, for the reasons explained below, he appears competent to represent himself at this early stage of the case. As to the second prong of the standard, the Court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." *Pennewell v. Parish*, 923 F.3d 486, 490 (7th Cir. 2019). The Court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds

the litigant's capacity as a layperson to coherently litigate the case." *Id.* This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." *Id.* at 490-91.

Harris' complaint is clear and coherent: It describes in detail what happened to him, highlights relevant legal principles, and explains the relief he seeks. Similarly, his motion to appoint counsel is extremely thorough, and is supported by a legal brief containing numerous relevant legal citations as well as a properly executed declaration. The Court rarely sees such sophisticated filings from prisoners. Although Harris points out that he suffers from mental health conditions, those conditions do not currently appear to be impacting his ability to advocate for himself. In short, the Court has no concerns about his ability to communicate with it or Defendants or to participate in discovery. To the extent Harris has limited access to the law library, the Court can, at his request, extend deadlines to give him more time, but Harris seems to already understand the legal framework of his claims, so he is unlikely to require significant library access during this phase of the case. Finally, Harris' limited knowledge of the law, the restrictions he faces because of COVID-19, and the "strongly disputed" nature of this case are circumstances that are true for all incarcerated litigants and therefore do not by themselves justify recruiting counsel. *See Bracey v. Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013). At this stage, the Court believes Harris is competent to represent himself, so the Court will deny his motion.

If during discovery, Harris encounters new challenges that he does not believe he can overcome on his own, he may renew his motion to appoint counsel. If he does so, he must explain what challenges he is facing and what efforts he has made to overcome them.

## CONCLUSION

The Court finds that Harris may proceed with Eighth Amendment claims against Pass, Immerfall, Smith, Tritt, Beahm, Martinez, Deblanc, Vollmer, Theander, Gruber, and Griffith. The Court will dismiss the remaining individuals and entities based on Harris' failure to state a claim against them.

**IT IS THEREFORE ORDERED** that Brian Foster, Meli, Wierenga, Dr. Toria M. Van Buren, Bonis, Judge Stark, Yana Pusich, Sanchez, Sgt. Mongey, Stanley Ridley, CO McCawley, Whyte, O'Neil, Fishe, John/Jane Doe, Crystal Marchant, Donna Larson, Dr. Jeffrey Manlove, Nathan Tapio, Corene Giebel, Dr. Farhat Khan, Michelle Schulz, Waupun Hospital, and Agnesian Healthcare are **DISMISSED**.

**IT IS FURTHER ORDERED** that Harris' motion for leave to proceed without prepayment of the filing fee (Dkt. No. 2) is **GRANTED**.

**IT IS FURTHER ORDERED** that Harris' motion to appoint counsel (Dkt. No. 8) is **DENIED without prejudice**.

**IT IS FURTHER ORDERED** that, pursuant to an informal service agreement between the Wisconsin Department of Justice and this Court, copies of Harris' complaint and this order are being electronically sent today to the Wisconsin Department of Justice for service on Pass, Immerfall, Smith, Tritt, Beahm, Martinez, Deblanc, Vollmer, Theander, Gruber, and Griffith.

**IT IS FURTHER ORDERED** that, pursuant to the informal service agreement between the Wisconsin Department of Justice and this Court, Pass, Immerfall, Smith, Tritt, Beahm, Martinez, Deblanc, Vollmer, Theander, Gruber, and Griffith shall file a responsive pleading to the complaint within **sixty days** of receiving electronic notice of this order.

**IT IS FURTHER ORDERED** that the agency having custody of Harris shall collect from his institution trust account the **$334.23** balance of the filing fee by collecting monthly payments from Harris' prison trust account in an amount equal to 20% of the preceding month's income credited to Harris' trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action. If Harris is transferred to another institution, the transferring institution shall forward a copy of this order along with Harris' remaining balance to the receiving institution.

**IT IS FURTHER ORDERED** that copies of this order be sent to the officer in charge of the agency where Harris is confined.

**IT IS FURTHER ORDERED** that the parties may not begin discovery until after the Court enters a scheduling order setting deadlines for discovery and dispositive motions.

**IT IS FURTHER ORDERED** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

>Honorable William C. Griesbach
>c/o Office of the Clerk
>United States District Court
>Eastern District of Wisconsin
>125 S. Jefferson Street, Suite 102
>Green Bay, WI 54301

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the matter.

Harris is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute.

In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties. Therefore, failure to provide your correct address could result in dismissal of your case for failure to prosecute.

Enclosed is a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that Harris may find useful in prosecuting this case.

Dated at Green Bay, Wisconsin this 15th day of December, 2021.

                                                    s/ William C. Griesbach
                                                    William C. Griesbach
                                                    United States District Judge